[Cite as *State v. Coogan*, 2014-Ohio-4775.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| State of Ohio, | : | |
| Plaintiff-Appellee, | : | |
| v. | : | No. 14AP-220 |
| | | (C.P.C. No. 13CR-3015) |
| Joseph Coogan, | : | |
| | | (REGULAR CALENDAR) |
| Defendant-Appellant. | : | |

D E C I S I O N

Rendered on October 28, 2014

*Ron O'Brien*, Prosecuting Attorney, and *Barbara A. Farnbacher*, for appellee.

*Paul Giorgianni*, for appellant.

APPEAL from the Franklin County Court of Common Pleas

TYACK, J.

{¶ 1} Defendant-appellant, Joseph Coogan, appeals his conviction on two counts of rape in violation of R.C. 2907.02, two counts of sexual battery in violation of R.C. 2907.03, and one count of kidnapping in violation of R.C. 2905.01. For the following reasons, we affirm the conviction and judgment of the Franklin County Court of Common Pleas.

{¶ 2} Appellant presents two assignments of error for our consideration:

> 1. The judgment of conviction is contrary to the manifest weight of the evidence.
>
> 2. Appointed defense counsel's closing argument was so deficient as to deny Mr. Coogan his constitutionally guaranteed right to effective assistance of counsel.

{¶ 3}   This case arises from an incident that occurred in the early morning hours of May 27, 2013 after a party in which both the victim ("KC") and appellant were drinking. The party occurred at a residence where Cierra Chapman, KC and KC's daughter were living.  In the early morning hours, KC became very intoxicated and then angry when talking about KC's mother.  The other party guests told her to go to bed and appellant carried KC upstairs to her bedroom, with SC, the 16-year-old brother of Cierra Chapman, showing the way.  Appellant is the biological father of KC who was 19 at the time.

{¶ 4}   At trial, KC testified that once appellant had taken her to her room, he laid her down on the bed and then he lay next to her.  She does not remember SC showing appellant where the bedroom was, nor does she remember having a cigarette with SC. She testified that appellant lay down on the bed with her fully clothed.  She said that he removed her pants, bra, and underwear and climbed on top of her.  He touched her breasts and inserted his fingers into her vagina.  He told her to be quiet and stop moving, while he held a blanket over her mouth.  KC testified that appellant had his clothes on but his pants were pulled down.

{¶ 5}   KC said that when Cierra Chapman came into the room appellant immediately stood up and zipped up his pants, told Cierra to watch KC and left the room. KC then told Cierra what had happened.  KC testified that she was menstruating at the time and was wearing a tampon, which appellant took out of her.  An ambulance and the police were called and KC was taken to a hospital.

{¶ 6}   Cierra Chapman testified that both KC and appellant were drinking and appellant carried KC up to her room after she became emotional at the end of the evening, with her brother SC showing the way.  Cierra said that after about 45 minutes to an hour, she went upstairs to the bedroom which she shared with KC.

{¶ 7}   When Cierra walked into the bedroom, appellant jumped up from lying on the bed and quickly covered KC with a blanket.  Appellant's pants and belt were unbuckled.  He put on his boots and fixed his belt.  He asked Cierra to watch KC because she was going to be sick and then Cierra showed him out of the bedroom with the light from her phone.

{¶ 8}   Once appellant left, Cierra turned on the light and KC sat up and said "I think my dad touched me."  (Tr. Vol. I, 111.)  Cierra uncovered the blanket and saw KC's

pants and underwear were down around her ankles. Her strapless bra was around her knees. She also had her shirt pulled up exposing her breasts. Cierra described KC as hysterical. KC would cry, pass out, then wake up and scream leave me alone. Cierra was able to get her mother, who was also at the party, to come to the bedroom. KC told Cierra's mother what happened and they called the police.

{¶ 9} SC, the 16-year-old brother of Cierra Chapman, said that he had not been drinking at the party. He testified that both appellant and KC lay down on the bed with their clothes on when he initially showed them KC's bedroom. SC testified that he went back to the bedroom after about 15 minutes to check on KC. He found both appellant and KC under a blanket. SC said that KC sat up and asked for a cigarette. All three of them smoked a cigarette and talked for a bit. Then SC left the bedroom.

{¶ 10} The State presented DNA evidence at trial which was collected from KC's underwear, bra and used tampon. The expert testified that the bra and tampon string both had some male DNA present. There was also male DNA found on vaginal and anal swabs from KC but not enough sample was present to make a more extensive comparison. On KC's underwear, the State's expert testified there was a significant amount of male DNA. The expert stated the frequency of the DNA profile for the DNA found on the underwear was one in every 3,333 unrelated male individuals and the appellant fit that profile.

{¶ 11} Appellant testified in his own defense and stated that after SC left the room for a second time both he and KC fell asleep on the bed. Appellant said that KC woke up and asked that he close the door, so he got up to close the door and realized that it was already closed. It was at this point he said KC starting taking her clothes off. Appellant said he told her to stop because he was still in the room. He testified he physically grabbed her arms and her pants to prevent her from taking her clothes off, at which point he put the blanket over her and she fell back asleep. Appellant testified he was trying to adjust his belt to leave when Cierra Chapman came in.

{¶ 12} Appellant's first assignment of error asserts the judgment of conviction is contrary to the manifest weight of the evidence. A manifest weight argument requires us to engage in a limited weighing of the evidence to determine whether there is enough competent and credible evidence so as to permit reasonable minds to find guilt beyond a

reasonable doubt and, thereby, to support the judgment of conviction. *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997). In so doing, the court of appeals, sits as a " 'thirteenth juror' " and, after " 'reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.' " *Id.*

{¶ 13} Issues of witness credibility and concerning the weight to attach to specific testimony remain primarily within the province of the trier of fact, whose opportunity to make those determinations is superior to that of a reviewing court. *State v. DeHass*, 10 Ohio St.2d 230, 231 (1967). The question is "whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed." *State v. Hancock*, 108 Ohio St.3d 57, 63, quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist.1983). The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against a conviction. *Thompkins* at 387.

{¶ 14} A jury may "take note of the inconsistencies and resolve or discount them accordingly * * * such inconsistencies do not render defendant's conviction against the manifest weight or sufficiency of the evidence." *State v. Nivens*, 10th Dist. No. 95APA09-1236 (May 28, 1996). "Furthermore, it is within the province of the jury to make the credibility of witnesses. ('It is the province of the jury to determine where the truth probably lies from conflicting statements, not only of different witnesses but by the same witness')." *State v. Dillon*, 10th Dist. No. 04AP-1211, 2005-Ohio-4124, ¶ 15 (citations omitted).

{¶ 15} Having examined the entire record, we find that there is enough competent and credible evidence to find guilt beyond a reasonable doubt. We note Cierra's testimony that she saw appellant buckling his pants when she entered the room, and saw him hastily covering KC with the blanket. The fact that Cierra found KC in such a state of undress under the blanket and the male DNA on the tampon from KC are also compelling pieces of evidence. We cannot say that the jury clearly lost its way and created a manifest miscarriage of justice. The fact KC was undressed when Cierra Chapman entered the room and appellant was securing his pants are not in dispute. The jury could well have

doubted appellant's testimony that his DNA came to be found on KC's cloths and tampon only because he was trying to keep KC dressed when she attempted to remove her own cloths.

{¶ 16} The first assignment of error is overruled.

{¶ 17} The second assignment of error asserts that the closing argument of the defense counsel was deficient and denied appellant effective assistance of counsel.

{¶ 18} A two-step process is employed when considering allegations of ineffective assistance of counsel:

> First, there must be a determination as to whether there has been a substantial violation of any of defense counsel's essential duties to his client. Next, and analytically separate from the question of whether the defendant's Sixth Amendment rights were violated, there must be a determination as to whether the defense was prejudiced by counsel's ineffectiveness.

*State v. Lytle*, 48 Ohio St.2d 391, 396-97 (1976), *vacated in part on other grounds*, (1978), 438 U.S. 910.

{¶ 19} A counsel's performance "will not be deemed ineffective unless and until counsel's performance is proved to have fallen below an objective standard of reasonable representation and, in addition, prejudice arises from counsel's performance." *State v. Bradley*, 42 Ohio St.3d 136 (1989), paragraph two of the syllabus. An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment. *Id.* To warrant reversal, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland v. Washington*, 466 U.S. 668, 694 (1984).

{¶ 20} The question is whether counsel acted outside the "wide range of professionally competent assistance." *Id.* at 690. Appellate courts must be highly deferential in scrutinizing counsel's performance. "A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight[.] * * * There are countless ways to provide effective assistance in any given case." *Id.* at 689.

> The evidence introduced at trial, however, will be devoted to issues of guilt or innocence, and the resulting record in many cases will not disclose the facts necessary to decide either prong of the Strickland analysis. If the alleged error is one of commission, the record may reflect the action taken by counsel but not the reasons for it. The appellate court may have no way of knowing whether a seemingly unusual or misguided action by counsel had a sound strategic motive or was taken because the counsel's alternatives were even worse.

*Massaro v. United States*, 538 U.S. 500, 505 (2003).

{¶ 21} Appellant's argument as to why the closing argument was deficient asserts counsel failed to point out alleged inconsistencies in KC's testimony. Appellant argues that failure to point out the inconsistencies increased the likelihood that the jury gave too much weight to her testimony. Specifically, appellant points out that KC was initially unsure whether an attack took place. Cierra had testified that KC had first said "I think my dad touched me." Later KC stated she did not know whether or not appellant penetrated her with his penis when she was questioned by an examining nurse at a hospital. Appellant asserts defense counsel should have argued that KC was paranoid. Appellant also states that counsel should have argued that the tampon string could have been contaminated with male DNA from being in the trash.

{¶ 22} Even if these bits of testimony had been emphasized in closing argument, we have no reason to find that the outcome of the trial would have been different. For us to find prejudicial error, appellant must show that there is a reasonable probability that, but for counsel's errors, the result of the trial would have been different. *Strickland* at 694. Appellant has failed to do so.

{¶ 23} The second assignment of error is overruled.

{¶ 24} Having overruled both assignments of error, we affirm the judgment of the Franklin County Court of Common Pleas.

*Judgment affirmed.*

SADLER, P.J. and CONNOR, J., concur.